UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. _____-Civ-_____

| | | |
|---|---|---|
| VINCENT A. HIRSCH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| JAMES E. LILLIE, MARTIN E. FRANKLIN, IAN G.H. ASHKEN, MICHAEL S. GROSS, ROBERT L. WOOD, IRWIN D. SIMON, WILLIAM P. LAUDER, ROS L'ESPERANCE, PETER A. HOCHFELDER, NEWELL RUBBERMAID INC., NCPF ACQUISITION CORP. I and NCPF ACQUISITION CORP. II, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

CLASS ACTION COMPLAINT

Plaintiff Vincent A. Hirsch ("plaintiff"), by the undersigned counsel, for this Class Action Complaint, alleges upon information and belief, except as to the allegations specifically pertaining to plaintiff, which are based on plaintiff's personal knowledge, as follows:

## NATURE OF THE ACTION

1.      This is a stockholder class action brought by plaintiff on behalf of the public stockholders of Jarden Corporation ("Jarden" or the "Company") against its Board of Directors (the "Board" or the "Individual Defendants"), Newell Rubbermaid Inc. ("Newell"), NCPF Acquisition Corp. I ("Merger Sub 1") and NCPF Acquisition Corp. II ("Merger Sub 2"), for violation of the Securities Exchange Act of 1934 (the "Exchange Act").  This action arises out of defendants' dissemination of a false and misleading proxy statement in violation of §§14(a) and 20(a) of the Exchange Act and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder.

2.      Defendants announced on December 14, 2015, that the Board had agreed to enter into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which: (i) Merger Sub 1 will be merged with and into Jarden, with Jarden surviving as a wholly-owned subsidiary of Newell; and (ii) immediately thereafter, Jarden will be merged with and into Merger Sub 2, with Merger Sub 2 continuing as a wholly-owned subsidiary of Newell (the "Combined Company") following the close of the transaction (collectively, the "Proposed Acquisition").  On the day the Proposed Acquisition was announced, the consideration to be received by Jarden stockholders had a nominal value of $60.03 per share, consisting of $21 in cash and a fixed exchange ratio of 0.862 shares (the "Exchange Ratio") of Newell common stock (collectively, the "Proposed Consideration").

3.      The stated nominal value of the Proposed Consideration is directly tied to the value of Newell's stock via the Exchange Ratio agreed to by the Board.  In the weeks following the announcement of the Proposed Acquisition, the price of Newell's common stock has collapsed, reaching a low of $35.47 per share on February 3, 2016.  This dramatic decline in the value of

Newell's stock has further eroded the premium Jarden's Board has touted publicly.  At Newell's stock price on February 23, 2016, the Proposed Consideration is worth only $53.64, which is $6.39 or nearly 10.6% less per share than the nominal value advertised to stockholders the day the Proposed Acquisition was announced.  Notably, on November 12, 2015, Newell offered to purchase Jarden for $57 per share.  The Board rejected that offer as "not adequate" in light of the Company's value.  The Proposed Consideration is currently worth $53.64, or 5.9%, less than this previously deemed inappropriate offer.  However, even at its claimed value of $60.03 per share, the Proposed Consideration fails to adequately compensate Jarden stockholders in light of Jarden's: (i) relative contributions to the Combined Company; (ii) recent acquisitions; and (iii) strong financial performance.

4.      The insufficient Proposed Consideration is not surprising in light of the unreasonable sales process undertaken by Jarden's Board in connection with the Proposed Acquisition.  From the outset, the Board permitted defendant Martin E. Franklin ("Franklin"), Jarden's founder and Executive Chairman of the Board, and other deeply conflicted Board members to cater the Company's sales process toward Newell, their preferred bidder.  Throughout the sales process, defendant Franklin was allowed to serve as Jarden's chief negotiator with Newell, even though defendant Franklin's interest in securing liquidity and hundreds of millions of dollars in change-in-control benefits should have disqualified him from controlling the process.

5.      Now, in an attempt to secure stockholder support for the Proposed Acquisition, on January 13, 2016, defendants filed with the SEC a materially false and misleading Registration Statement on Form S-4.  On February 17, 2016, defendants filed Amendment No. 1 to that Registration Statement with the SEC (hereafter, the "Proxy").  The Proxy, which recommends that Jarden stockholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information concerning: (i) the Company's flawed and self-serving sales process; (ii) the free cash flow projections provided by Jarden's management and relied on by Barclays Capital Inc.

("Barclays") and Centerview Partners LLC ("Centerview") in performing their discounted cash flow ("DCF") valuation analyses; (iii) Barclays' and UBS Securities LLC's ("UBS") conflicts of interest; (iv) Jarden's contributions to the Combined Company; (v) and the Board's consideration of Jarden's standalone value, in contravention of §§14(a) and 20(a) of the Exchange Act.

6.      Plaintiff seeks injunctive relief preventing consummation of the Proposed Acquisition, unless and until defendants' Exchange Act violations are appropriately remedied.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the claims asserted herein for violations of §§14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to §27 of the Exchange Act.  This Court has supplemental jurisdiction under 28 U.S.C. §1367.

8.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391 because Jarden's principal executive offices are located at 1800 North Military Trail, Boca Raton, Florida.

## THE PARTIES

10.     Plaintiff Vincent A. Hirsch is and has been a stockholder of Jarden at all times relevant hereto.

11.     Non-defendant Jarden is a Delaware corporation with principal executive offices located at 1800 North Military Trail, Boca Raton, Florida.  Jarden is a global consumer products company that offers a portfolio of over 120 brands sold through a variety of distribution channels, including club, department store, drug, grocery, mass merchant, sporting goods, and specialty retailers, as well as directly to consumers.  The Company operates in three primary business segments: Branded Consumables, Consumer Solutions, and Outdoor Solutions.  As of December 31,

2014, Jarden employed over 33,000 people in Canada, Europe, Latin America, the Pacific Rim (including China) and the United States.  Upon completion of the Proposed Acquisition, Jarden will become a direct wholly-owned subsidiary defendant Newell.

12.    Defendant James E. Lillie ("Lillie") is Jarden's Chief Executive Officer ("CEO") and has been since June 2011 and a director and has been since 2011.  Defendant Lillie was also Jarden's Chief Operating Officer from August 2003 to June 2011 and President from January 2004 to June 2011.  In connection with the Proposed Acquisition, defendant Lillie secured for himself the accelerated vesting of his various holdings in the Company in addition to tens of millions of dollars in change-in-control benefits.  Further, defendant Lillie secured for Mariposa Capital, LLC ("Mariposa Capital"), a company he controls, an advisory agreement with Newell following the close of the Proposed Acquisition.

13.    Defendant Franklin is Jarden's Executive Chairman of the Board and has been since June 2011 and a director and has been since June 2001.  Defendant Franklin is the founder of Jarden.  Defendant Franklin was Jarden's Chairman of the Board and CEO from September 2001 to June 2011.  In connection with the Proposed Acquisition, defendant Franklin secured for himself the accelerated vesting of his various holdings in the Company in addition to hundreds of millions of dollars in change-in-control benefits, including the right to use Jarden's corporate jet and an option to purchase Jarden's Aspen, Colorado, office at below fair market value.  Further, defendant Franklin secured for Mariposa Capital, a company he controls, an advisory agreement with Newell and he will join the board of directors of the Combined Company following the close of the Proposed Acquisition.

14.    Defendant Ian G.H. Ashken ("Ashken") is Jarden's Vice Chairman of the Board and has been since September 2001; President and has been since March 2014; and a director and has been since June 2001.  Defendant Ashken is also the co-founder of Jarden.  Defendant Ashken was Jarden's Chief Financial Officer ("CFO") from September 2001 to June 2014 and Secretary from

September 2001 to February 2007.  In connection with the Proposed Acquisition, defendant Ashken secured for himself the accelerated vesting of his various holdings in the Company in addition to tens of millions of dollars in change-in-control benefits.  Further, defendant Ashken for Mariposa Capital, a company he controls, an advisory agreement with Newell and he will join the board of directors of the Combined Company following the close of the Proposed Acquisition.

15.     Defendant Michael S. Gross ("Gross") is Jarden's Lead Independent Director and has been since at least April 2012 and a director and has been since March 2007.  In connection with the Proposed Acquisition, defendant Gross agreed to sell the Company to Newell in order to secure liquidity for his Jarden shares.

16.     Defendant Robert L. Wood ("Wood") is Jarden director and has been since at least February 2000.  In connection with the Proposed Acquisition, defendant Wood agreed to sell the Company to Newell in order to secure liquidity for his Jarden shares.

17.     Defendant Irwin D. Simon ("Simon") is a Jarden director and has been since May 2002.  Defendant Simon was the Lead Independent Director from at least April 2004 to at least April 2011.  In connection with the Proposed Acquisition, defendant Simon agreed to sell the Company to Newell in order to secure liquidity for his Jarden shares.

18.     Defendant William P. Lauder ("Lauder") is a Jarden director and has been since 2011.  In connection with the Proposed Acquisition, defendant Lauder agreed to sell the Company to Newell in order to secure liquidity for his Jarden shares.

19.     Defendant Ros L'Esperance ("L'Esperance") is a Jarden director and has been since March 2014.  In connection with the Proposed Acquisition, defendant L'Esperance, secured the engagement of UBS as Jarden's financial advisor through which she directly benefited as UBS's Head of Corporate Client Solutions.  Further, defendant L'Esperance secured continued employment for herself and will join the board of directors of the Combined Company following the close of the Proposed Acquisition.

20.     Defendant Peter A. Hochfelder ("Hochfelder") is a Jarden director and has been since June 2015.  In connection with the Proposed Acquisition, defendant Hochfelder agreed to sell the Company to Newell in order to secure liquidity for his Jarden shares.

21.     Defendant Newell is a Delaware corporation with principal executive offices located at Three Glenlake Parkway, Atlanta, Georgia.  Defendant Newell is a global marketer of consumer and commercial products in five segments: Writing, Home Solutions, Tools, Commercial Products, and Baby & Parenting.  Upon completion of the Proposed Acquisition, defendant Newell will change its name to Newell Brands Inc.

22.     Defendant Merger Sub 1 is a Delaware corporation and a wholly-owned subsidiary of defendant Newell.  Upon completion of the Proposed Acquisition, defendant Merger Sub 1 will merge with and into Jarden and cease its separate corporate existence.

23.     Defendant Merger Sub 2 is a Delaware corporation and a wholly-owned subsidiary of defendant Newell.  Upon completion of the merger between defendant Merger Sub 1 and Jarden, defendant Merger Sub 2 will merge with and into Jarden, with defendant Merger Sub 2 continuing as the surviving corporation.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all other public stockholders of Jarden that have been or will be harmed by defendants' conduct described herein (the "Class").  Excluded from the Class are defendants and any individual or entity affiliated with any defendant.

25.     This action is properly maintainable as a class action.

26.     The Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, there were over 219 million shares of Jarden common stock outstanding as of December 10, 2015.

27.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual Class member.  The common questions include the following:

(a)     whether defendants have violated Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder by disseminating a materially false and misleading Proxy to Jarden stockholders;

(b)     whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers designed to discourage other potentially interested parties from making an offer to acquire the Company or its assets;

(c)     whether defendants are unjustly enriching themselves and other insiders or affiliates of the Company at the expense of Jarden stockholders and/or their fiduciary obligations; and

(d)     whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

28.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

29.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately represent and protect the interests of the Class.

30.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

31.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Defendants have acted, or failed to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## BACKGROUND TO THE PROPOSED ACQUISITION

33.     Founded in 2001 by defendants Franklin and Ashken, Jarden is a leading provider of consumer products with over 120 brands sold globally.  Since 2002, Jarden has completed 23 acquisitions of businesses in the cosmetics, household, and personal care sectors that constituted more than 1% of Jarden's consolidated revenue at the time each was consummated.  The Company's products are distributed and sold at major retail outlets around the world, including Walmart, Academy Sports & Outdoors, Amazon.com, Bed Bath and Beyond, Canadian Tire, Costco, Dick's Sporting Goods, The Home Depot, Kroger, Lowe's, and Target.

34.     In the months leading up the Proposed Acquisition, Jarden was well positioned for strong, standalone growth after completing nearly $3 billion in acquisitions during fiscal year 2015.  On July 13, 2015, Jarden announced that it was acquiring disposable tableware maker Waddington Group, Inc. for $1.35 billion.  At the time the deal was announced, Jarden disclosed that it expected the acquisition to contribute approximately $800 million to Jarden's revenue in 2016.  Commenting on the Waddington Group, Inc. acquisition, defendant Lillie noted:

> This acquisition should immediately enhance our financial performance and create exciting new revenue drivers.  Our complementary businesses – further enhanced by our combined deep bench of management talent – lay the foundation for new cross-selling opportunities, cross-brand collaboration, and cross-business support.  These initiatives should accelerate revenue growth across our global platform and help drive long-term shareholder value.  Jarden's global presence, capabilities and scale will help Waddington's expansion into new markets and geographies to further drive top-line growth and profitability.  At the same time, Waddington should enhance and accelerate Jarden's growth in the B2B market.  Potential future cost and distribution synergies will help support investments and drive bottom-line improvements across the Jarden platform.

35.     Similarly, on October 14, 2015, Jarden announced that the Company was acquiring Visant Holding Corp. (the parent company of customizable product maker Jostens, Inc.) for $1.5 billion.  In a press release discussing the transaction, defendant Lillie commented:

> This acquisition is expected to enhance our gross profit and operating margins in 2016.  We believe we can expand and further diversify our revenue and strengthen relationships in the educational and achievement channel as we develop revenue synergies across Jostens' platform, Rawlings scholastic sports equipment and uniform business, as well as Yankee Candle's scholastic fundraising business.  All three businesses have unique and well-established relationships in this channel. Jostens, as a trusted partner in the educational and achievement channel, enhances Jarden's unique access to this channel.  Jarden's consumer products capabilities and scale will help accelerate Jostens expand into new products and adjacent markets to support top-line growth and profitability.  We expect that cost synergies generated will be largely reinvested into product innovation.

36.     Prior to the Proposed Acquisition, Jarden employed a decentralized business model that allowed its acquired companies to continue to operate on an individual basis.  This decentralized model prevented Jarden from fully realizing the benefits and value of each of its acquired businesses.[1]  In the lead up to the Proposed Acquisition, however, the Board never paused to consider unlocking the value of these companies through initiatives to integrate or drive organic margin expansion.

37.     The strength of Jarden's standalone business is also reflected in the Company's strong financial performance prior to the Proposed Acquisition.  On October 29, 2015, Jarden issued a press release announcing its third quarter results, which reflected the Company's performance for the nine months ended September 30, 2015.  In the press release, the Company reported: (i) organic net sales growth of 6% or $128 million; (ii) net sales of $2.3 billion, compared to only $2.1 billion during the same period in 2014; and (iii) adjusted net income of $168 million, compared to a mere $150 million

---

[1]     As a result of the Proposed Acquisition, Newell, which already operates in an integrated fashion, is positioned to alone capture the yet unrealized value of Jarden's acquired businesses.  As Deutsche Bank analysts Bill Schmitz Jr. and Faiza Alwy observed in their December 7, 2015 report, "Jarden operates at a decentralized level while Newell is becoming a more integrated operating company, with perhaps an opportunity for [Newell] CEO [Michael B.] Polk to create a similar marketing-driven operating company out of the Jarden silos."

during the same period in the prior year.  The press release also noted that Jarden beat consensus analyst estimates for sales for the fourth consecutive quarter.  Commenting on the Company's success, defendant Lillie noted:

> We continue to see very positive momentum in our year to date and quarterly results as well as in our fourth quarter and 2016 forecast.  Posting third quarter broad-based organic growth of 6.0% and a nine-month organic growth rate of 5.9%, further affirms our comfort with meeting or exceeding our goal of 3%-5% average organic annual growth.  Segment earnings margin of 15.4% for the quarter is indicative of our focus on achieving consistent, long-term, profitable growth, particularly given nearly 200 basis points of transactional foreign exchange headwinds.  I am also pleased to report that our acquisition and swift integration of Waddington is on track and that they are delivering revenue, earnings and synergies in line with our expectations.  We are well positioned to integrate and begin accelerating the long term growth of Jostens upon its closing.

38.     Finally, price targets set by several leading industry analysts only further demonstrate the degree to which Jarden was poised for organic growth.  In the several months leading up to the announcement of the Proposed Acquisition, *at least five analysts* set price targets for Jarden that valued shares of the Company well above the $60.03 per share offer price.  Analysts from both CJS Securities and D.A. Davidson & Co. had price targets that valued Jarden at $64 per share the day before the Proposed Acquisition was announced.  Similarly, Oppenheimer & Co. and KeyBanc Capital Markets set price targets of $63 per Jarden share, while J.P. Morgan had a price target of $62 per share the day before the Proposed Acquisition was announced.

39.     Despite the strength of Jarden's standalone prospects, the Board decided to plot a different course for the Company – one designed to benefit insiders financially and professionally at the expense of Jarden stockholders.

40.     In the summer of 2015, Newell engaged Centerview to review a possible strategic transaction.  On September 9, 2015, a representative of Centerview introduced defendant Franklin to Michael B. Polk ("Polk"), the President and CEO of Newell, at an industry conference hosted by Barclays.  At the same meeting, defendant Franklin introduced Polk to defendant Lillie, who was also present at the Barclays conference.  At this meeting, defendants Franklin and Lillie discussed

with Polk a potential combination of the two companies. Afterwards, defendant Franklin telephoned Polk to suggest that they continue their discussions, and the two agreed to meet again in Miami, Florida, on October 5, 2015.

41.     During the following week, defendant Franklin spoke individually with select members of Jarden's Board regarding his discussions with Newell. Tellingly, the Proxy omits whether the Board was previously aware of discussions between Polk and defendants Franklin and Lillie or whether the Board authorized defendants Franklin and Lillie to discuss a possible sale of the Company. Further, the Proxy does not disclose the identity of the directors or indicate why the full Board was not apprised of defendant Franklin's efforts to sell the Company.

42.     On October 5, 2015, defendants Franklin and Lillie met with Polk to discuss a sale of Jarden. Following these discussions, Jarden and Newell executed a mutual confidentiality and standstill agreement and began to exchange high-level non-public information on October 15, 2015.

43.     On October 16, 2015, defendant Franklin and Polk privately discussed the terms of a potential sale, including a mixture of cash and stock consideration. However, the Proxy omits the following information: (i) the implied value of the proposed consideration; (ii) the exchange ratio; (iii) pro forma ownership; and (iv) the number of Jarden directors, that was discussed by the parties. Inexplicably, defendant Franklin did not inform the Board of his conversation with Polk, or the terms they discussed, until almost *two weeks later* on October 28, 2015.

44.     On October 22, 2015, defendants Franklin, Ashken, and Lillie met with representatives from Newell, Barclays, and Centerview. At the meeting, the defendants presented an overview of Jarden's business and discussed acquisitions that Jarden had recently completed. The Proxy does not disclose whether defendants discussed that Jarden had yet to unlock the value of its recent acquisitions, or whether the Proposed Consideration reflects the benefits of scale that Jarden had yet to realize after acquiring these businesses.

45.     On October 28, 2015, defendant Franklin informed Jarden's Board for the first time of his October 16th discussions with Polk regarding the terms of a possible combination.

46.     On November 12, 2015, Newell submitted a written indication of interest ("IOI") to acquire Jarden at an implied value of $57 per share.  The IOI proposed a fixed exchange ratio of 0.823 shares of Newell common stock and $20 in cash.

47.     Jarden's Board held a special meeting that afternoon to review Newell's IOI. Jarden's Board determined that it "did not believe that the $57.00 stock and cash consideration proposed by Newell Rubbermaid adequately reflected the relative contributions of Jarden . . . to the pro forma combined company."  The Board then instructed defendant Franklin and Barclays to seek consideration that "more appropriately reflected the relative contributions of [Jarden] to the pro forma combined company and the value accretion and synergies that could be achieved by such combination."

48.     On November 16, 2015, during a meeting between representatives of Newell and Jarden, Barclays communicated the Board's position that Newell's "***$57.00 price indication was not adequate, that an exchange ratio of 0.925 of a share of Newell Rubbermaid common stock for each share of Jarden common stock plus $21.00 in cash for each share of Jarden common stock would be more appropriate***."  Defendant Franklin also demanded that the board of directors of the Combined Company include seats for Jarden directors in addition to himself.

49.     On November 21, 2015, Newell delivered a revised IOI ("Revised IOI") to acquire Jarden at an implied value of $60.03 per share.  The Proxy states that the Revised IOI proposed mixed consideration of $21 in cash and a "fixed exchange ratio" of Newell common stock, but fails to disclose the fixed exchange ratio in the offer.  Finally, the Revised IOI also contemplated that defendant Franklin and at least two other Jarden directors would join the board of directors of the Combined Company.

50.     The next day, Jarden's Board held a special meeting to consider the Revised IOI. While Barclays and Greenberg Traurig, LLP discussed with the Board the implications and potential consequences of a fixed exchange ratio without a value collar, the Proxy fails to disclose whether the Board directed its representatives to negotiate for a price collar or the Board's rationale for why no collar was ever proposed.[2]

51.     Also on November 22, 2015, defendant Franklin recommended that the Board hire both Barclays and UBS to serve as financial advisors to Jarden.  At this meeting, the Board was first informed of Barclays' lucrative prior engagements with Newell, even though Barclays had already been permitted to play a critical role in shaping Jarden's sales process.  Further, the Proxy notes that the Board considered, with respect to the engagement of UBS, that defendant L'Esperance was concurrently serving as the Head of Client Corporate Solutions for UBS and a member of the Board. Notwithstanding these conflicts of interest, the Board retained both Barclays and UBS to serve as Jarden's financial advisors in connection with the Proposed Acquisition and formally retained them on November 24, 2015 and December 2, 2015, respectively.

52.     The very next day, on November 23, 2015, Jarden entered into a second 35-day mutual exclusivity agreement with Newell.  Under the terms of the agreement, Jarden was forbidden from conducting any discussions, negotiations, or solicitation activities with, or responding to any unsolicited offers or proposals from, any other party regarding a possible business combination. Jarden agreed to enter into the second mutual exclusivity agreement even though the Board ***never considered or directed its financial advisors to consider or conduct a market check*** to determine if

---

[2]     At the time the Board approved the Proposed Acquisition, it was aware that the value of Newell's common stock could fluctuate and that Newell was subject to market risk that could materially impact the price of its publicly traded shares.  Despite this knowledge, the Board failed to secure or even negotiate a price collar, which would have ensured that Jarden stockholders would receive at least the nominal value of the Proposed Consideration on the day the Proposed Acquisition was announced.

there were any other potential strategic or financial acquirers interested in making an offer for Jarden.

53.     From December 11 to December 13, 2015, representatives of Jarden and Newell held discussions regarding the fixed exchange ratio.  Following these discussions, the parties agreed to a final exchange ratio of 0.862 shares of Newell common stock.  The Proxy does not disclose why Jarden agreed to a fixed exchange ratio of just 0.862 after the Board previously communicated to Newell less than a month prior that "***an exchange ratio of 0.925***" presented a more "***appropriate***" value for Jarden stockholders.

54.     Jarden's Board held a special meeting on December 13, 2015, the day before the Proposed Acquisition was announced, to make last minute changes to defendant Franklin's, Ashken's and Lillie's employment agreements and approve their severance agreements.  As discussed further below, the effect of these last minute approvals was to increase by ***tens of millions of dollars*** the amount of change-in-control benefits defendants Franklin, Ashken, and Lillie will receive in connection with the Proposed Acquisition.

55.     After voting on the severance agreements, Jarden's Board unanimously approved the Merger Agreement.  Prior to approving the Merger Agreement, however, the Board never contacted Newell to determine its best and final offer or instructed their financial advisors to determine whether other acquirers were potentially interested in making a superior offer for Jarden.

56.     On December 14, 2015, Jarden issued a press release announcing the Proposed Acquisition.  The press release stated, in relevant part:

> Newell Rubbermaid and Jarden Corporation today announced that they have entered into a definitive agreement to combine the two companies.  The transaction creates a $16 billion consumer goods company to be named Newell Brands, with a portfolio of leading brands in large unconsolidated categories, including Paper Mate®, Sharpie®, EXPO®, Parker®, Elmer's®, Calphalon®, Rubbermaid®, Graco®, Baby Jogger®, Aprica®, Goody®, Irwin®, Lenox®, Rubbermaid Commercial Products®, Coleman®, First Alert®, FoodSaver®, Jostens®, K2®, NUK®, Oster®, Rawlings®, Sunbeam® and Yankee Candle®.  The scaled enterprise is expected to accelerate profitable growth with leading brands that compete in a global market that exceeds $100 billion, with business and capability development supported by the efficiencies of this transformational combination.

\*     \*     \*

Under the terms of the agreement, Jarden shareholders will receive, for each Jarden share, $21 in cash and 0.862 shares of Newell Rubbermaid stock at closing. Based on Newell Rubbermaid's closing share price as of December 11, 2015, the implied total consideration would be $60 per share, which represents a 24 percent premium to Jarden's 30-day volume weighted average share price as of December 11, 2015.

The transaction will be funded by cash on hand, debt and equity issued to Jarden shareholders; convertible bondholders will be entitled to convert in exchange for the merger consideration in conjunction with the transaction. Newell Rubbermaid has obtained a committed bridge facility, which it expects to replace with permanent financing prior to closing. Newell Brands intends to maintain its investment grade credit rating by using strong cash flow from the combined company to prioritize debt reduction in the short term towards a target leverage ratio of 3.0 to 3.5 times. Newell Brands expects to achieve the target ratio within two to three years, while simultaneously maintaining or increasing its dividend per share.

Newell Rubbermaid anticipates incremental annualized cost synergies of approximately $500 million over four years, driven by efficiencies of scale and new efficiencies in procurement, cost to serve and infrastructure that the combination unlocks. The company's intent is to design a benchmarked, efficient set of structures that support long term business development. The transaction is projected to be immediately accretive with strong double-digit normalized earnings per share accretion post synergy realization.

The acquisition is subject to approval by shareholders of both Newell Rubbermaid and Jarden Corporation, receipt of regulatory approvals and other customary closing conditions. The transaction is expected to close in the second quarter of 2016.

## THE FALSE AND MATERIALLY MISLEADING PROXY

57.     In order to secure stockholder approval of the unfair Proposed Acquisition, defendants filed the false and materially misleading Proxy with the SEC on January 13, 2016. The Proxy misrepresents and/or omits material information necessary for Jarden stockholders to make an informed decision whether to vote in favor of the Proposed Acquisition. Specifically, as set forth below, the Proxy fails to provide Company stockholders with material information and/or provides them with materially misleading information concerning: (i) the Company's flawed and self-serving sales process; (ii) the free cash flow projections provided by Jarden's management and relied on by Barclays and Centerview in performing their DCF analyses; (iii) Barclays' and UBS' conflicts of

interest; (iv) Jarden's contributions to the Combined Company; and (v) the Board's consideration of Jarden's standalone value.

**Disclosure Deficiencies Concerning the Conflicted Sales Process**

58.     With respect to the sales process that led to the Proposed Acquisition, the "Background of the Merger Transactions" section contained on pages 65-78 of the Proxy is materially deficient in that it fails to disclose:

(a)     the Board's rationale for its failure to consider a pre-signing market check or instruct its financial advisors to determine if any other potential strategic or financial acquirers were interested in making a superior offer for the Company; and

(b)     the terms of the: (i) mutual confidentiality agreement and standstill agreement Jarden entered into on October 15, 2015; and (ii) 35-day mutual confidentiality agreement Jarden entered into on November 23, 2015.

59.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 67 of the Proxy:

On October 15, 2015, Jarden and Newell Rubbermaid executed a mutual confidentiality and standstill agreement and began to exchange high-level non-public information.

(b)     from page 70 of the Proxy:

Representatives of Greenberg Traurig informed the Jarden board that the transaction contemplated by such proposal constituted a true business combination and not a sale of control transaction because of the common stock and cash consideration mix, the fact that the surviving corporation's common stock would be widely held and remain listed and publicly traded on the NYSE and the fact that no single person or group would own or control a majority or a substantial percentage of the voting power of the pro forma combined company. In view of the fact that Jarden was not for sale and the unique long-term benefits that potentially could be achieved only from a possible business combination with Newell Rubbermaid, no purchaser candidates or alternate business combination partners were contacted by Jarden and the sole strategic alternative to a proposed business combination with Newell Rubbermaid was for Jarden to continue to operate as an independent public company.

      (c)      from page 71 of the Proxy:

Discussion then ensued regarding (1) the structure and improved economic terms of Newell Rubbermaid's revised proposal, (2) the nature, timing and scope of Jarden's business, financial and legal due diligence review of Newell Rubbermaid, (3) the appropriateness of Jarden entering into a limited period of mutual exclusivity with Newell Rubbermaid (in relation to Newell Rubbermaid's proposed requirement that Jarden enter into a unilateral exclusivity agreement), and (4) completing the economic terms of Jarden's formal engagement of Barclays and UBS to assist Jarden in its review and evaluation of the possible transaction and, in the case of Barclays, to deliver to the Jarden board an opinion as to the fairness, from a financial point of view, to Jarden stockholders of the consideration to be offered to such stockholders in a proposed business combination with Newell Rubbermaid (if the Jarden board so requested in connection with its consideration of entering into a definitive agreement providing for such business combination).

      (d)      from page 71 of the Proxy:

On November 23, 2015, Newell Rubbermaid and Jarden entered into a mutual exclusivity agreement pursuant to which Jarden and Newell Rubbermaid each agreed, for a period of 35 days, not to conduct any discussions, negotiations or solicitation activities with, and not to respond to any unsolicited offers or proposals from, any other party regarding a possible business combination or similar extraordinary corporate transaction, with a mutual option under certain circumstances to extend such exclusivity period for up to an additional 10 days if necessary to finalize the negotiation of definitive merger and other transaction documentation, to complete due diligence and to finalize the terms of Newell Rubbermaid's financing commitments for the proposed business combination. Under the mutual exclusivity agreement, each party was entitled to terminate deal discussions and negotiations at any time.

      (e)      from page 78 of the Proxy:

After further deliberation and discussion by the Jarden board regarding the terms of the draft merger agreement and consideration of all of the business, financial and market factors as set forth below under "– *Jarden's Reasons for the Merger Transactions; Recommendation of the Jarden Board of Directors*", all of the members of the Jarden board who were present and in attendance at the December 13, 2015 meeting of the Jarden board at which the merger agreement was being considered (other than one director who was recused from the portion of such meeting relating to the vote with respect to the merger agreement and who did not vote on the merger agreement or the other transactions contemplated thereby), duly adopted resolutions (1) approving the merger agreement, the merger transactions and the other transactions contemplated by the merger agreement, (2) determining that the terms of the merger transactions and the other transactions contemplated by the merger agreement are fair to and in the best interests of Jarden and its stockholders, (3) recommending that Jarden stockholders vote affirmatively to adopt the merger agreement, (4) declaring that the merger agreement is advisable in accordance with Section 251(a) of the Delaware General Corporation Law, (5) adopting and approving amendments to Messrs. Franklin's, Ashken's and Lillie's executive

employment agreements and (6) adopting and approving separation agreements with Messrs. Franklin, Ashken and Lillie.

60.     These statements in the Proxy are rendered false and/or misleading by the omissions identified above in ¶58 because they give stockholders a materially incomplete and distorted picture of the sales process underlying the Proposed Acquisition, the various alternatives available to (but not considered by) the Individual Defendants other than the Proposed Acquisition, and the efforts taken (or not taken) to ensure that the Proposed Consideration agreed to by the Board reflected the best possible price available to Jarden stockholders.  Without this omitted information, Jarden stockholders cannot make a fully-informed decision whether to vote to approve the Proposed Acquisition.

**Disclosure Deficiencies Concerning the Free Cash
Flow Projections Prepared by Jarden's Management**

61.     The Proxy cites to and annexes the opinions of Jarden's financial advisor Barclays and Newell's financial advisor Centerview.  These "fairness" opinions purport that the Proposed Consideration to be received in connection with the Proposed Acquisition is fair from a financial point of view.  However, the Proxy fails to disclose the free cash flow projections that were prepared by Jarden's management and incorporated into the DCF analyses performed by Barclays and Centerview in connection with their respective fairness opinions.

62.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 100 of the Proxy:

Discounted Cash Flow Analysis

Centerview performed a discounted cash flow analysis of Jarden, which is a traditional valuation methodology used to derive a valuation of an asset by calculating the "present value" of estimated future cash flows of the asset. "Present value" refers to the current value of future cash flows and is obtained by discounting those future cash flows by a discount rate that takes into account macroeconomic assumptions and estimates of risk, the opportunity cost of capital, expected returns and other appropriate factors.

In performing this analysis, Centerview calculated the estimated present value of the unlevered free cash flows of Jarden reflected in the Jarden forecasts for 2016 through 2020. The terminal value of Jarden at the end of the forecast period was estimated by using perpetuity growth rates ranging from 1.5% to 2.5%. The unlevered free cash flows and terminal values were then discounted to present value using discount rates ranging from 6.75% to 7.75%. This range of discount rates was determined based on Centerview's analysis of Jarden's weighted average cost of capital. Based on its analysis, Centerview calculated a range of implied values per share of Jarden common stock, rounded to the nearest $1.00, of $39.00 to $67.00 per share.

(b)      from page 106-107 of the Proxy:

*Discounted Cash Flow Analysis*

\*      \*      \*

To calculate the estimated enterprise value (total equity market capitalization, plus debt, less cash and cash equivalents), or EV, of Jarden using the DCF method, Barclays added (i) Jarden's projected aftertax unlevered free cash flows for fiscal years 2016 through 2020 based on the Jarden Projections; (ii) the terminal value of Jarden as of December 31, 2020; and (iii) the tax benefits associated with the amortization of Jarden's existing purchased intangibles, and discounted such amount to its present value using a range of selected discount rates. The after-tax unlevered free cash flows were calculated by taking the tax-affected earnings before interest, adding depreciation and amortization (excluding amortization of purchased intangibles), subtracting capital expenditures and adjusting for changes in net working capital. The residual value of Jarden at the end of the forecast period (i.e., December 31, 2020), or terminal value, was estimated by selecting a range of EBITDA exit multiples of 10.5x to 11.5x, which range was derived by analyzing the results from the selected comparable company analysis described below and the trading history of Jarden's common stock, and applying such range to the Jarden Projections for 2020. The tax benefits associated with the amortization of Jarden's existing purchased intangibles for each year were calculated by multiplying such amortization expense in the given year, as provided by Jarden, with Jarden's estimated marginal tax rate, as provided by Jarden. The range of discount rates of 7.50% to 8.50% was selected based on an analysis of the weighted average cost of capital, or WACC, of Jarden and the comparable companies used in the selected comparable company analysis described below. Barclays then calculated a range of implied prices per share of Jarden common stock by subtracting estimated net debt, as provided in Jarden's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2015, from the estimated enterprise value using the discounted cash flow method and dividing such amount by the estimated fully diluted number of shares of Jarden common stock, as provided in Jarden's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2015. The result of this analysis implied a range of value per share of Jarden common stock of $52.85 to $61.45.

\*      \*      \*

Barclays noted that on the basis of the DCF analysis, the implied value of the merger consideration of $60.03 was within the range of implied values per share of Jarden common stock calculated using the Jarden Projections.

(c)      from page 123-124 of the Proxy:

*Jarden Unaudited Financial Forecasts*

The following table summarizes the unaudited financial forecasts related to Jarden on a stand-alone basis without giving effect to the merger transactions, prepared by Jarden's management as described above, used by the Jarden board for purposes of its consideration of the merger transactions and by Barclays for purposes of its financial analyses:

| *(in millions)* | For the Years Ending December 31, | | | | | |
| | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E |
|---|---|---|---|---|---|---|
| Total net sales | $8,658 | $10,147 | $10,640 | $11,172 | $11,731 | $12,317 |
| Adjusted EBITDA[1] | $1,197 | $ 1,566 | $ 1,719 | $ 1,874 | $ 2,010 | $ 2,154 |
| Adjusted net income[1] | $  555 | $  724 | $  832 | $  947 | $ 1,046 | $ 1,148 |

(1)  The adjustments from GAAP to non-GAAP financial measures include adjustments relating to certain restructuring costs, acquisition-related and other costs, non-cash purchase accounting adjustments, the elimination of manufacturer's profit in inventory, Venezuela related charges (deconsolidation, hyperinflationary and foreign exchange-related charges), non-cash stock-based compensation costs, non-cash original issue discount amortization and other items, as applicable. The reconciliation of net income to each of EBITDA, segment earnings and adjusted net income is presented below.

| *(in millions)* | For the Years Ending December 31, | | | | | |
| | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E |
|---|---|---|---|---|---|---|
| Net income | $  375 | $  629 | $  745 | $  860 | $  958 | $1,061 |
| Interest | 226 | 282 | 265 | 238 | 218 | 200 |
| Taxes | 196 | 324 | 384 | 443 | 494 | 546 |
| Depreciation and amortization | 238 | 306 | 325 | 333 | 340 | 347 |
| EBITDA | $1,035 | $1,541 | $1,719 | $1,874 | $2,010 | $2,154 |
| Other adjustments: | | | | | | |
| Acquisition-related and other costs, net | $   94 | $   23 | $  — | $  — | $  — | $  — |
| Restructuring costs, net | 7 | 2 | — | — | — | — |
| Venezuela related charges | 61 | — | — | — | — | — |
| Adjusted EBITDA | $1,197 | $1,566 | $1,719 | $1,874 | $2,010 | $2,154 |

| *(in millions)* | For the Years Ending December 31, | | | | | |
| | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E |
|---|---|---|---|---|---|---|
| Net income | $  375 | $  629 | $  745 | $  860 | $  958 | $ 1,061 |
| Amortization | 57 | 77 | 93 | 93 | 93 | 93 |
| Non-cash original issue discount amortization | 39 | 41 | 39 | 39 | 39 | 39 |
| Other adjustments | 162 | 25 | — | — | — | — |
| Tax provision adjustment | (78) | (48) | (45) | (45) | (44) | (45) |
| Adjusted net income | $  555 | $  724 | $  832 | $  947 | $1,046 | $ 1,148 |

63.     These statements in the Proxy are rendered false and/or misleading by the omissions identified above in ¶61 because: (i) free cash flows represent an essential input in any discounted cash flow modeling, and (ii) Jarden's omitted free cash flow projections were relied on and expressly incorporated into the DCF analyses performed by Barclays and Centerview.  Notably, the free cash flow projections prepared by Newell's management are properly disclosed in the Proxy.  Without the similar disclosure of Jarden's free cash flow projections, stockholders will be unable to recreate or properly evaluate the equity values derived by the DCF analyses performed by Barclays and Centerview in support of the "fairness" of the Proposed Acquisition.

**Disclosure Deficiencies Concerning Potential**
**Conflicts of Interest of Barclays and UBS**

64.     The Proxy fails to disclose the following information concerning the potential conflicts of interest impacting the independent and disinterested nature of the financial and advisory services performed by Barclays and UBS during the sales process:

(a)     whether Jarden's Board was aware that an affiliate of Barclays intended (and later agreed) to serve as a Tier 1 syndicate lender on Newell's revolving credit facility and to increase its total loan commitment to Newell in December 2015; and

(b)     the specific services UBS and Barclays, or any of their affiliates,  provided to Jarden and Newell in the two years preceding the announcement of the Proposed Acquisition and the amount of compensation received for the services rendered.

65.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a)     from page 71 of the Proxy:

The Jarden board then discussed and considered Barclays' previous engagement history with Newell Rubbermaid and the historical fees received by Barclays in connection with such engagements. . . .  Following such discussion, the Jarden board discussed both Barclays' and UBS' relationship and previous engagement history with Jarden and certain of Jarden's directors and management employees, and the experience and credentials of the M&A advisory teams for each financial advisory firm, and determined that Barclays' M&A advisory team and UBS' M&A advisory team were well-qualified to serve as co-financial advisors to Jarden in connection

with the possible combination with Newell Rubbermaid.  With respect to UBS, it was noted that Ms. Ros L'Esperance is the Head of Client Corporate Solutions of UBS, and as such she would be recused from all deliberations and votes of the Jarden board, if any, in respect of the possible business combination with Newell Rubbermaid.

66.     The full disclosure of the nature and scope of Barclays' and UBS's relationship with Jarden and Newell is necessary in order for stockholders to afford proper weight to the potential conflicts that may have shaped the overall sales process or fairness analyses.  Without this omitted material information, Jarden stockholders are unable to assess whether (and to what extent) Jarden's financial advisors may have been motivated to steer the sales process in favor of Newell – at the expense of other more value maximizing transactions – for their own self-interested reasons.  This omitted information is made even more material by the fact that Jarden failed to conduct a pre-signing market check or undertake any steps to assess whether other acquirers might be interested in offering more for the Company.

**Disclosure Deficiencies Concerning Jarden's
Contributions to the Combined Company**

67.     The Proxy fails to disclose material information regarding the Board's consideration of Jarden's contributions to the Combined Company.  In particular, the Proxy omits:

       (a)     whether the Board instructed Barclays or UBS to conduct contribution analyses;[3] and

       (b)     the results of any contribution analyses performed by Barclays or UBS in connection with the Proposed Acquisition.

68.     The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

---

[3]     A contribution analysis is a valuation methodology used to determine the appropriateness of an offer price based on an evaluation of the relative contributions of both the buyer and seller to the combined company.

(a)     from page 67-68 of the Proxy:

On October 22, 2015, Messrs. Franklin, Ashken, Lillie, Polk and Tarchetti held a meeting at Jarden's offices in Norwalk, Connecticut, which representatives from Barclays and Centerview also attended. At the meeting, Messrs. Franklin, Ashken and Lillie presented a detailed overview of Jarden's three primary business segments, including historical and forward-looking financial information, acquisitions that Jarden had recently completed or was contemplating and various other aspects of Jarden's operations, including Jarden's "direct-to-consumer" initiative, Jarden's supply chain, Jarden's approach to revenue and cost synergies following acquisitions, Jarden's development of a "shared service" platform, including its applicability to international as well as domestic operations, and Jarden's approach to planning, budgeting, employee compensation and talent development. Following the presentation, the parties agreed that Newell Rubbermaid would proceed with conducting a comprehensive analysis of Jarden's results of operations, operating cash flows and financial condition to assess the potential value accretion and synergies that might be realized from a possible combination of Newell Rubbermaid with Jarden, and the possible contribution of each company to a pro forma combined company. The participants agreed that if, following such analyses, a possible transaction appeared to be attractive to Newell Rubbermaid's management, Newell Rubbermaid would review the matter with the Newell Rubbermaid board.

(b)     from pages 69 of the Proxy:

Later that day, the Jarden board held a special telephonic meeting, at which representatives of Barclays and Greenberg Traurig, LLP, Jarden's counsel, were present. At the meeting, representatives of Barclays discussed and reviewed with the Jarden board the Newell Rubbermaid proposal. Representatives of Greenberg Traurig then discussed with the Jarden board the fiduciary duties of the Jarden board with respect to their consideration of the Newell Rubbermaid proposal. The Jarden board determined that a possible business combination between the two companies on improved economic and other terms could produce compelling revenue and cost synergy and enable Jarden stockholders to benefit from significant value accretion over the long term. However, the Jarden board did not believe that the $57.00 stock and cash consideration proposed by Newell Rubbermaid adequately reflected the relative contributions of Jarden and Newell Rubbermaid to the pro forma combined company. The Jarden board instructed Mr. Franklin and Barclays to continue discussions with representatives of Newell Rubbermaid regarding a possible combination of the two companies on improved economic terms that it believed more appropriately reflected the relative contributions of each standalone company to the pro forma combined company and the value accretion and synergies that could be achieved by such combination.

(c)     from page 69 of the Proxy:

On November 16, 2015, representatives of Jarden's executive management team, Newell Rubbermaid's executive management team, the non-executive Chairman of the Newell Rubbermaid board, Barclays, Centerview and Goldman Sachs met in New York City to further explore the terms of a possible business combination. At the meeting, the participants discussed the relative revenue,

earnings and EBITDA contributions of the two companies, the standalone values of the two companies, governance matters and the potential structure of a possible transaction.

      (d)     from page 70 of the Proxy:

Later on November 21, 2015, Jarden's senior management team met to discuss Newell Rubbermaid's revised indication of interest and agreed to report to the Jarden board that, subject to Jarden's completion of comprehensive business, financial and legal due diligence (including obtaining from Newell Rubbermaid information about its intended bridge financing and permanent financing arrangements to fund the cash portion of the merger consideration, refinance certain Jarden debt and to pay related fees and expenses), the revised economic terms in Newell Rubbermaid's proposal more accurately reflected the standalone values of the two companies, the relative contributions of Jarden and Newell Rubbermaid to the pro forma combined company, and the expected synergies that could be achieved by a possible combination of the two companies, and that discussions between the parties should continue with a view to preparing and negotiating a mutually acceptable definitive merger agreement.

69.     These statements in the Proxy are rendered false and/or misleading by the omissions identified above in ¶67 because they imply that Jarden's Board and management adequately considered (and were provided with) information analyzing Jarden's contributions to the Combined Company. However, the Proxy does not disclose whether Barclays or UBS performed contribution analyses that were provided to the Board, and Barclays' fairness opinion (annexed to the Proxy) does not include a contribution analysis. This information is essential for stockholders to determine whether the Proposed Consideration adequately compensates them in light of Jarden's contributions to the Combined Company.[4]

---

[4]     Notably, Newell directed Centerview, its financial advisor, to perform a contribution analysis. Centerview's contribution analysis utilized financial projections prepared by Jarden's management to evaluate Jarden's contributions to the Combined Company. The results of Centerview's contribution analysis show that Jarden's contributions to the Combined Company, excluding synergies, are 53% and 59% to its Enterprise Value ("EV") and earnings before interest, taxes, depreciation, and amortization ("EBITDA"), respectively, for calendar 2016. Although Centerview's analysis makes clear that Jarden is contributing 53% and 59% to the Combined Company's EV and EBITDA, respectively, the Proposed Consideration Jarden stockholders are receiving represents just 51% of the deal value.

**Disclosure Deficiencies Regarding Jarden's Standalone Business**

70.     With respect to the consideration and valuation of Jarden's standalone business, the

Proxy fails to disclose the specific initiatives and standalone plan reviewed by the Board, including

the consideration of: (i) changes to Jarden's existing business model; and (ii) proposals to reorganize

or operate the Company in a more integrated fashion (similar to the model employed by Newell).

71.     The omission of this information renders the following statements in the Proxy false

and/or materially misleading in contravention of the Exchange Act:

(a)     from page 67-68 of the Proxy:

On October 22, 2015, Messrs. Franklin, Ashken, Lillie, Polk and Tarchetti held a meeting at Jarden's offices in Norwalk, Connecticut, which representatives from Barclays and Centerview also attended.  At the meeting, Messrs. Franklin, Ashken and Lillie presented a detailed overview of Jarden's three primary business segments, including historical and forward-looking financial information, acquisitions that Jarden had recently completed or was contemplating and various other aspects of Jarden's operations, including Jarden's "direct-to-consumer" initiative, Jarden's supply chain, Jarden's approach to revenue and cost synergies following acquisitions, Jarden's development of a "shared service" platform, including its applicability to international as well as domestic operations, and Jarden's approach to planning, budgeting, employee compensation and talent development. Following the presentation, the parties agreed that Newell Rubbermaid would proceed with conducting a comprehensive analysis of Jarden's results of operations, operating cash flows and financial condition to assess the potential value accretion and synergies that might be realized from a possible combination of Newell Rubbermaid with Jarden, and the possible contribution of each company to a pro forma combined company.  The participants agreed that if, following such analyses, a possible transaction appeared to be attractive to Newell Rubbermaid's management, Newell Rubbermaid would review the matter with the Newell Rubbermaid board.

(b)     from page 70 of the Proxy:

Later on November 21, 2015, Jarden's senior management team met to discuss Newell Rubbermaid's revised indication of interest and agreed to report to the Jarden board that, subject to Jarden's completion of comprehensive business, financial and legal due diligence (including obtaining from Newell Rubbermaid information about its intended bridge financing and permanent financing arrangements to fund the cash portion of the merger consideration, refinance certain Jarden debt and to pay related fees and expenses), the revised economic terms in Newell Rubbermaid's proposal more accurately reflected the standalone values of the two companies, the relative contributions of Jarden and Newell Rubbermaid to the pro forma combined company, and the expected synergies that could be achieved by a possible combination of the two companies, and that discussions between the

parties should continue with a view to preparing and negotiating a mutually acceptable definitive merger agreement.

(c)    from pages 75 of the Proxy:

On December 10, 2015, the Jarden board held a regularly scheduled meeting, at which representatives of Barclays, UBS, PricewaterhouseCoopers LLP, referred to as PWC, and Greenberg Traurig were present.  At this meeting, representatives of Greenberg Traurig made a presentation regarding the possible combination with Newell Rubbermaid and the negotiation process to date, addressed and summarized for the Jarden board the material terms of and the remaining open issues in the merger agreement, and addressed legal requirements in respect of the possible combination.  The Jarden board also considered and discussed the potential benefits and risks to Jarden stockholders of the possible combination with Newell Rubbermaid, the value accretion to Jarden stockholders that could result from such possible combination, the consideration being offered to Jarden stockholders and the ability of Jarden stockholders to participate in the future earnings growth and value accretion of the combined company, as compared with the alternative of Jarden continuing as a standalone company.

72.    These statements in the Proxy are rendered false and/or misleading by the omissions identified above in ¶70 because they create the false and misleading impression that the Board and management reviewed and evaluated specific initiatives to improve Jarden's standalone value prior to approving the Proposed Acquisition.  However, the Proxy fails to disclose whether the Board considered plans to integrate its disparate businesses or unlock the value of Jarden's recently completed acquisitions.  In fact, the "Background of the Merger Transactions" section of the Proxy is devoid of any reference to the Company's $1.5 billion acquisition of Visant, even though the Visant acquisition closed during the middle of Jarden's sales process in November 2015.  The failure to disclose whether the Board considered specific plans to reorganize its standalone business, or any other proposals likely to result in organic value creation, further prevents stockholders from evaluating the adequacy of the Proposed Consideration negotiated by the Board.

73.    Defendants' failure to provide Jarden stockholders with the foregoing material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the

Proxy.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Acquisition, plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Acquisition and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

<strong>DEFENDANTS' INTERESTS IN THE PROPOSED ACQUISITION</strong>

74.     Defendants are misleading Jarden stockholders into voting in favor of the Proposed Acquisition in order to reap a staggering financial windfall for their part in securing the deal with Newell.  The Company's Board and management were highly motivated to sell Jarden to Newell because the transaction would provide them with liquidity for their previously illiquid and/or locked-up holdings in the Company.  Together the Individual Defendants control over 11.3 million shares of Jarden, or 5.9% of its outstanding stock.  Once consummated, the Board and management will no longer be governed by SEC regulations controlling timing and the number of shares they are permitted to sell.

75.     Additionally, through the Proposed Acquisition, the Individual Defendants secured the right to cancel all outstanding restricted stock awards and convert them into Jarden common stock with a per share exercise price equal to the Proposed Consideration.  The accelerated vesting of these equity benefits would not have occurred had the Board decided to continue to operate the Company on a standalone basis.  The following table summarizes the ***nearly one billion dollars*** in merger related compensation Jarden's Board will receive in connection with the Proposed Acquisition:

| Defendants | Common Share Consideration | | Accelerated Consideration | | Total Merger Consideration | |
|---|---|---|---|---|---|---|
| Martin E. Franklin | $ | 404,380,080.00 | $ | 150,316,181.00 | $ | 554,696,261.00 |
| Ian G. H. Ashken | $ | 122,769,420.00 | $ | 72,955,404.00 | $ | 195,724,824.00 |
| James E. Lillie | $ | 90,911,280.00 | $ | 72,955,404.00 | $ | 163,866,684.00 |
| Michael S. Gross | $ | 6,319,080.00 | $ | 222,748.00 | $ | 6,541,828.00 |
| Peter A. Hochfelder | $ | 213,000.00 | $ | 222,748.00 | $ | 435,748.00 |
| William P. Lauder | $ | 3,079,080.00 | $ | 222,748.00 | $ | 3,301,828.00 |
| Ros L'Esperance | $ | 311,580.00 | $ | 222,748.00 | $ | 534,328.00 |
| Irwin D. Simon | $ | 2,226,660.00 | $ | 222,748.00 | $ | 2,449,408.00 |
| Robert L. Wood | $ | 4,577,940.00 | $ | 222,748.00 | $ | 4,800,688.00 |
| **Total** | $ | 634,788,120.00 | $ | 297,563,477.00 | $ | 932,351,597.00 |

76.    Further, several of the Individual Defendants used the sales process to negotiate for themselves additional lucrative change-in-control benefits not shared with Jarden's public stockholders.  In connection with the Proposed Acquisition, defendants Franklin, Ashken, and Lillie are expected to receive ***nearly $350 million in golden parachute compensation*** in addition to other benefits.  This additional windfall only further confirms the troubling degree to which conflicts of interest infected Jarden's sales process.  The below table summarizes the additional change-in-control benefits defendants Franklin, Lillie, and Ashken secured in connection with the Proposed Acquisition:

**Golden Parachute Compensation**

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Other ($)(4) | Totals ($) |
|---|---|---|---|---|---|
| **Martin E. Franklin** | 23,969,836 | 150,316,181 | 944,346 | 5,000,000 | 180,230,363 |
| **Ian G.H. Ashken** | 11,227,642 | 72,955,404 | 672,951 | — | 84,855,997 |
| **James E. Lillie** | 11,227,642 | 72,955,404 | 154,071 | — | 84,337,117 |

77.    On December 13, 2015, the day before the Proposed Acquisition was announced, the Board approved changes to defendants Franklin's, Ashken's and Lillie's employment agreements. The Board agreed to "update" the annual amount of restricted stock grants each of these defendants was expected to receive through December 31, 2018.  The effect of these "updates" was to

dramatically increase the number of restricted stock grants each would be entitled to receive in the event of a change-in-control, such as the Proposed Acquisition.

78.     After voting to revise defendants Franklin's, Ashken's and Lillie's employment agreements, Jarden's Board then voted to approve separation agreements based on the revised employment agreements.  Under the terms of the separation agreements, defendants Franklin, Ashken, and Lillie will each receive the increased number of restricted shares for 2017 and 2018 that were added to their employment agreements by the Board just moments prior.  Under the severance agreements and amended employee agreements, defendants Franklin, Ashken, and Lillie will receive restricted shares convertible to 743,421, 334,440 and 334,440 shares of Jarden common stock, respectively, at the effective time of the Proposed Acquisition.

79.     Pursuant to the terms of the separation agreements approved by the Board, defendants Franklin, Ashken, and Lillie will also receive, among other benefits, cash severances payments equal to: (i) 300% of the executive's annualized base salary; *plus* (ii) 300% of the average annual bonus to the executives over the two immediately preceding fiscal years; *plus* (iii) the amount of the executive's bonus accrued.  In connection with the Proposed Acquisition, defendants Franklin, Ashken, and Lillie will receive cash severance payments equal to $23,969,836, $11,227,642, and $11,227,642, respectively.

80.     In addition to the above, defendant Franklin's separation agreement grants him *"continued personal use of Jarden's existing aircraft for a period of three years* . . . at Jarden's sole cost and expense for the first 75 hours in any calendar year."  In addition, defendant Franklin is entitled to "purchase the aircraft at any time until December 31, 2016, for a purchase price equal to the aircraft's tax basis."  Further, defendant Franklin secured an option to acquire Jarden's Aspen, Colorado, office for a purchase price equal to Jarden's tax basis in the property, which is less than its fair market value.

81.     Defendants Franklin, Ashken, and Lilly also negotiated continuing employment for themselves.  On December 13, 2015, Newell entered into an advisory services agreement with Mariposa Capital, which is controlled by defendants Franklin, Ashken, and Lillie.  Under the terms of the agreement, Mariposa Capital will purportedly provide "strategic advisory services" to Newell for at least three years after the effective time of the Proposed Acquisition.  The services agreement requires Newell to provide Mariposa Capital: (i) "office space and bear all reasonable costs and expenses of the overhead and support services relating to such office"; and (ii) the "use of private aircraft."  Pursuant the agreement, Mariposa Capital will be paid an annual fee of $4 million for its services and Newell cannot terminate the agreement without paying a termination fee of $12 million.

82.     Further, defendants Franklin and Ashken also secured going-forward positions at Newell.  After the close of the Proposed Acquisition, defendants Franklin and Askhen and an additional unnamed member of Jarden's Board will fill three of thirteen seats on the board of directors of the Combined Company.

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

83.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

84.     During the relevant period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

85.     By virtue of their positions within Jarden, the defendants were aware of this information and of their duty to disclose this information in the Proxy.  The Proxy was prepared, reviewed, and/or disseminated by all of the defendants.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair

consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company's and Newell's assets.  The defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

86.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

87.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

88.     Because of the false and misleading statements in the Proxy, plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violation
### of Section 20(a) of the Exchange Act

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     The Individual Defendants acted as controlling persons of Jarden within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Jarden and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

91.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Jarden, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were, thus, directly involved in the making of the document.

93.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Acquisition. The Proxy purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the directors.

94.     By virtue of the foregoing, the Individual Defendants have violated §20(a) of the Exchange Act.

95.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Jarden's stockholders will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in plaintiff's favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until they comply with their obligations under §§14(a) and 20(a) of the Exchange Act to provide stockholders with all material information about the unfair sales process for the Company, the conflicts of interest suffered by defendants in connection with the Proposed Acquisition, the inadequate consideration offered in the Proposed Acquisition, and the actual intrinsic value of the Company and Newell;

C.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

D.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

E.     Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury in all claims so triable.

DATED:  February 24, 2016              ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                       STUART A. DAVIDSON
                                       Florida Bar No. 84824


                                       _____*s/Stuart A. Davidson*_____
                                       STUART A. DAVIDSON

                                       120 East Palmetto Park Road, Suite 500
                                       Boca Raton, FL 33432
                                       Telephone:  561/750-3000
                                       561/750-3364 (fax)
                                       Email:  sdavidson@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
Email:  dwissbroecker@rgrdlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
600 B Street, Suite 1900
San Diego, CA  92101
Telephone:  619/525-3990
619/525-3991 (fax)
Email:  brobbins@robbinsarroyo.com
        soddo@robbinsarroyo.com

Attorneys for Plaintiff